[No. B149321. Second Dist., Div. Five. Feb. 22, 2002.]

THE PEOPLE, Plaintiff and Appellant, v.
BRENDA CRANEY, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part 2 of the Discussion.

## COUNSEL

Steve Cooley, District Attorney, Patrick D. Moran, and Fred Klink, Deputy District Attorneys, for Plaintiff and Appellant.

Michael P. Judge, Public Defender, Albert J. Menaster, Gail Jaffe, and Alex Ricciardulli, Deputy Public Defenders, for Defendant and Respondent.

## OPINION

**ARMSTRONG, J.**—A jury convicted respondent Brenda Craney of violating Penal Code[1] section 273a, subdivision (b), a misdemeanor. The trial court dismissed the case under section 1385. The People of the State of California appeal from that order. In the published portion of this opinion, we find that the order is appealable. In the unpublished portion, we find that

---

[1]All further statutory references are to that code.

the evidence was insufficient to support the judgment. We thus affirm the trial court.

*Summary*

On the morning of April 25, 1999, three-year-old Elijah J. suffered hot water immersion burns. Elijah lived with Craney, his foster mother, and Craney's adult daughter Leona Hightower. Craney was not at home when Elijah received the burns, but had left him in Hightower's care. Elijah died of his injuries.

Hightower was charged with second degree murder (§ 187, subd. (a)), assault on a child causing death (§ 273a, subd. (b)), and torture (§ 206). She was also charged with felony child abuse (§ 273a, subd. (a)) arising out of a different incident. Craney was charged with felony child abuse under section 273a, subdivision (a).

The prosecution's theory of Hightower's guilt was that she had deliberately placed Elijah into a tub of scalding water. The defense theory was that Hightower ran a bath and left the bathroom so that Elijah could use the toilet, and that Elijah climbed or slipped into the tub while unattended. The prosecution had two theories regarding Craney: that she allowed Hightower to care for Elijah although she knew that Hightower had previously abused him, and that she violated section 273a by failing to call 911 as soon as she knew that Elijah was in pain.

The torture count against Hightower was dismissed under section 1181 and a jury found her not guilty of the remaining charges. Craney was convicted of the lesser included offense of misdemeanor child abuse (§ 273a, subd. (b))[2] on a jury finding that she had "willfully caused or permitted a child to suffer unjustifiable pain or mental suffering as a result of failing to seek immediate medical care."[3]

Craney moved for a new trial. In lieu of granting that motion, the trial court dismissed the case pursuant to section 1385, finding that the evidence

---

[2]In full, subdivision (b) of section 273a provides that "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor." Subdivision (a) of the statute, which defines felony child abuse, is identical except that it proscribes conduct which takes place in circumstances or conditions which are likely to produce great bodily harm or death.

[3]She was acquitted on the other theory, after a jury failed to make a true or not true finding on the special verdict which read "We find Defendant Craney, having care and custody of the child, as a result of leaving the child in the custody of another willfully caused or permitted

was insufficient to support the jury verdict and specifically finding that the evidence was insufficient to support a finding that Craney acted with the intent to cause or permit Elijah to suffer pain.

### Factual and Procedural Summary

On the theory on which Craney was convicted, the jury heard or saw tapes of Hightower's and Craney's interviews with the police,[4] heard a tape of the 911 call, and heard testimony from Brenda Gilbert, Elijah's Department of Children and Family Services social worker, and other witnesses.

### Hightower

Hightower told police that on the morning of April 25, she gave Elijah his breakfast, then started to run a bath for herself. When Craney left the house to pick up her other children, who were at a relative's house, Hightower decided not to take her bath until Craney returned. Hightower left Elijah alone in the bathroom so that he could use the toilet. When she realized that Elijah had been in the bathwater, she paged Craney. She did not realize how hot the water was and thought that Elijah was only scalded.

When Craney called in response to the page, Hightower said that Elijah had gotten into her bathwater. Craney asked whether he was out of the water, and Hightower said that he was. Craney said "All right. I'm on my way to take him to the hospital." Hightower told Craney that she would put Elijah in cold water until then.

Hightower did put Elijah into cold water. He was not crying, but when Hightower took him out of the water, she realized that his skin was coming off. She paged Craney again, then poured peroxide on Elijah.

When Craney got home, she spoke to social worker Brenda Gilbert on the telephone. Craney said that she needed to take Elijah to the hospital, but the social worker told her to wait.

### Craney

Craney told the police that her pager went off before she reached her relative's house. She called Hightower as soon as she got out of the car.

---

the child to be injured or to be placed in a situation where his person or health was endangered."

[4]The jury saw a videotape of Hightower's interview with the police and heard an audiotape of Craney's interview. The jury was provided with transcripts of both interviews.

Hightower was screaming and crying, and said that Craney had to get home because Elijah had fallen into a tub of hot water. Craney started screaming too, and said, "I'll be there in a minute. I got to get him to the doctor." She knew that Hightower had not yet called the paramedics. Craney told her relative what had happened and went home. It took her about 10 minutes to get there.

When Craney got home, Hightower was pouring peroxide on Elijah, who was lying on the floor. He had blisters on his back. Craney started crying. She said "Oh, God, we got to get him to the hospital." She then paged Elijah's social worker, Brenda Gilbert. She did this because "they tell you [you] have to call the Department of Children Services. You have to call them and let them know any time something happens to a baby." Gilbert called right back. Craney told Gilbert that Elijah had fallen into the tub and been burned, and that she was on her way to the hospital with him. Gilbert said "don't do anything," then spoke to Hightower.

After speaking to Gilbert, Hightower told Craney not to do anything, that Gilbert was on her way. Gilbert arrived about 10 minutes later and said that the paramedics should be called. Hightower had already called 911.

*Gilbert*

Gilbert testified that when she called in response to Craney's page, Craney was screaming and crying. Someone in the background was screaming, too. When Gilbert realized that she was speaking to Craney, she asked "What's wrong?" Craney just kept screaming. Hightower got on the phone and said something which Gilbert could not understand. She asked to speak to Craney again. Craney got on the phone and said "Come now." Gilbert again asked what was wrong, but Craney said only "come now." Gilbert said she would come right away and might have said "Wait, I am coming right now." She did not want Craney to take any action until she got there and found out what was going on. Gilbert did not hear Craney say that Elijah had fallen into the tub or that she was taking him to the hospital. Gilbert left the house less than five minutes later, still in her pajamas. It took her about 15 minutes to get to Craney's home. When Gilbert got to Craney's home, Craney was hysterical. She might have told Gilbert that she wanted to take Elijah to the hospital. Elijah was not crying. He was just staring into space. Gilbert looked at him and told Craney to call 911. She thought his injuries were very serious. Craney said that 911 would take too long, but Gilbert told her that it would only take a few minutes. Gilbert believed that the 911 call was made three to five minutes after she got to Craney's house. Paramedics arrived less than five minutes later.

Gilbert also testified that she had visited Elijah at least once a month in the three years she had been his social worker. She also saw Craney during those visits. She never saw any signs of abuse. She believed that Craney provided a loving and safe environment for Elijah and was a loving guardian. She did not believe that Craney would willfully delay getting emergency care for Elijah.

*The 911 call*

It was Hightower who called 911. She told the 911 operator that Elijah had fallen into a tub of hot water and burned his leg. In response to questions, she said that he had also burned his butt and his elbow, that he was not having difficulty breathing, and that he was alert. When she was asked whether he was in a lot of pain she answered "I would think so." She was advised to put Elijah into cool water. Gilbert also spoke to the 911 operator. Among other things, she said, "He's in a lot of pain, I could tell."

*Other Evidence*

Robert Pumphrey, the paramedic who responded to Hightower's 911 call, testified that when he arrived Elijah was in the drained bathtub under a cold shower. Elijah had first and second degree burns over 50 percent of his body, with blistering and sloughing of the skin. Pumphrey concluded that the burns were critical and transported Elijah to the emergency room with full lights and sirens. Elijah was crying when Pumphrey arrived, but he stopped crying after paramedics wrapped him in a sheet and got him into the ambulance.

Dr. William Dougherty, who treated Elijah in the hospital, testified the most painful part of a burn is "while you are getting the burn." On cross-examination, Dougherty was questioned about the pain Elijah might have suffered from his burns. He testified that as a burn evolves, nerves can die so that the area of the burn is numbed, and that the process can be immediate, but also testified that even where some nerves die, it would be highly likely that there would still be a painful area of burns, with burns like Elijah's.

Defense witness Dr. Jerold Kaplan testified that a burn victim should first be treated by cooling the burn, which both helps the body repair itself and acts as an analgesic.

For the defense, a plumber testified that he checked the water heater at Craney's house on April 26, the day after Elijah was burned. He discovered that the valve which should have limited the water temperature to 120 degrees was inoperable, so that the temperature could go up to 160 degrees.

The defense also called John Amador, a social worker who evaluated Elijah at the Regional Center in April of 1999 and observed Elijah with Craney. He testified that Elijah and Craney had a warm, loving, connected relationship. They held hands, and Elijah fell asleep in Craney's lap.

Other witnesses testified positively about Craney's character. Nineteen-year-old Erika Gillohm testified that she had lived with Craney at various times, and that Craney fed, clothed, and cared for her simply because she needed a home. Gillohm did not believe that Craney would ever neglect a child's medical needs. She treated all her children well, and treated Elijah like the other children. Stacey Betancourt testified similarly.

The evidence on the timing of these events was controverted and uncertain. Gilbert testified that she was not sure when she spoke to Craney, but at the preliminary hearing testified that it was between 11:00 and 11:15. The transcript of the 911 call indicates that the call was made at 12:14. However, Los Angeles Police Department officers who responded to the call noted on their report that they arrived at the scene at 11:45. Paramedics were already present when they arrived.

Detective Tizano of the Los Angeles Police Department testified the distance between Gilbert's house and Craney's house was 11.5 miles. It took him 21 minutes to drive that route at 6:00 p.m. on a weeknight, in moderate traffic. It took him nine minutes to drive from Craney's relative's house, her location when she got Hightower's page, to Craney's house.

*The dismissal*

After the verdict, Craney moved for a new trial on the ground that the verdict was inconsistent with the weight of the evidence and with Hightower's acquittal. She asked the court to evaluate the evidence as a "thirteenth juror."

In its ruling, the court first noted that under section 1181, "the court is required to weigh the evidence and exercise its independent judgment based on the evidence," and that "in the exercise of its supervisory power over the verdict, the court on motion for a new trial should consider the probative force of the evidence and satisfy itself that the evidence as a whole is sufficient to sustain the verdict." The court went on to say that "[t]his court has a great deal of difficulty accepting the jury's verdict. The evidence showed that Brenda Craney was a loving and caring caregiver to Elijah. . . . The assertion that Craney would have intentionally permitted the child to suffer is inconsistent with the evidence that she truly loved this

child. There was uncontroverted evidence that Craney became hysterical upon seeing the victim's injuries. Social worker Brenda Gilbert testified when defendant Craney called her, she was hysterical. My recollection of the testimony was that Gilbert did instruct Craney to stay there."

The court then discussed the medical evidence, noting that "there was additional testimony from the various burn experts that pain ceases when a burn progresses to third degree. The temperature of the water and the even depth of the injuries in this case suggest the majority of Elijah's burns [were] third degree and his body was shutting down by the time Craney came on the scene."

The court noted that the sound of crying was audible on the tape of the 911 call, that there was disputed evidence about the source of that sound, but that "for purposes of this decision . . . the court presumes the crying was that of Elijah."

The court concluded that "[n]o doubt as conceded by counsel in retrospect, Mrs. Craney would agree that she should have called 911 immediately before calling the social worker. But the evidence does support the view that Miss Craney was panicking and not thinking clearly when confronted with the seriously injured Elijah. The question is, did defendant Craney willfully not call 911 for the purpose of having Elijah suffer? When I consider all the evidence, I conclude that her failure to call 911 was due to the emergent [*sic*] nature of the circumstances and her own inability to cope and not due to an intent to have the child suffer. Can a person in defendant Craney's position, that is a person responsible for the care of a child, be guilty of a violation of section [273a, subdivision (b)] for failing to call 911 under these circumstances? The court thinks not. I conclude that I cannot say she purposefully delayed calling 911 for the purpose of having the child suffer."

The court determined that Craney's motion for new trial was meritorious in that the verdict was contrary to the law and evidence, but also found that if a new trial were granted, there would be no sustainable criminal charge, due to the implied acquittal on the prosecution's alternate theory. "I therefore on my own motion consider whether this remaining count should be dismissed pursuant to Penal Code section 1385 which holds that a court on its own motion may in furtherance of justice order an action to be dismissed. I conclude that jeopardy has attached and that the evidence to support the theory of conviction identified by the jury was insufficient. I therefore rule the conviction is reversed and the case dismissed in the interest of justice due to the insufficiency of the evidence."

*Discussion*

### 1. *The order is appealable*

█   Appellant begins its brief by asking us to find that the trial court order is appealable, based on *People v. Salgado* (2001) 88 Cal.App.4th 5 [105 Cal.Rptr.2d 373]. We agree with the reasoning and result of *Salgado* and agree that the order is appealable.

In *Salgado*, a jury convicted the defendant of carjacking and of assault with a firearm. The trial court granted a new trial, then dismissed the carjacking count on a finding that the evidence was insufficient to support the verdict. The Court of Appeal determined that the order "[was] appealable under section 1238, subdivision (a)(8) because it occurred after a verdict of guilty by the jury."[5] (*People v. Salgado, supra,* 88 Cal.App.4th at p. 11.) The court also determined that appeal was not precluded by constitutional prohibitions against double jeopardy because "a successful appeal will not require a retrial. Salgado's prosecution can be resolved by entering judgment on the verdict. Far from placing him in jeopardy a second time, a reversal of the dismissal simply restores Salgado to the position which he found himself in after the jury verdict in his only trial." (*Id.* at p. 12.) "The purpose of the double jeopardy clause . . . is not undermined when the jury reaches a guilty verdict before the trial court acts. Even if it is the functional equivalent of an acquittal, appellate review of a dismissal for legal insufficiency will not result in another trial. Where the jury convicts and the court then 'acquits,' an error in the court's ruling can be corrected . . . ." (*Id.* at p. 13.)

The court also determined that the conviction was supported by substantial evidence and thus reversed the judgment of dismissal and remanded the case to the trial court for sentencing on the carjacking count, resentencing on the assault with a firearm count, and entry of judgment on jury verdicts. (*People v. Salgado, supra,* 88 Cal.App.4th at p. 16.)

Craney argues that *Salgado* erred when it concluded that that there was no possibility of a retrial on remand. She posits two scenarios in which, she contends, a new trial could be ordered. First, if we were to reverse the trial court and reinstate the verdict, the trial court could reweigh the evidence as a "thirteenth juror" and order a new trial, on her motion for new trial. (§ 1181, subd. 6.) Craney also proposes that if we were to reverse the trial

---

[5]Section 1238 provides that "(a) An appeal may be taken by the people from any of the following: [¶] . . . [¶] (8) An order or judgment dismissing or otherwise terminating all or any portion of the action including such an order or judgment after a verdict or finding of guilty or an order or judgment entered before the defendant has been placed in jeopardy or where the defendant has waived jeopardy."

court's ruling, on remand the trial court could dismiss in the case in interests of justice and the prosecution could refile.

Although *Salgado* does not specifically address either scenario, the analysis of that case provides the answer to these contentions. *Salgado* essentially held that the critical factor on an appeal such as this one is the defendant's conviction by jury, not the later "acquittal" by the judge. Were we to find that the trial court's order of dismissal was erroneous, our ruling would merely restore Craney to the position she found herself in after her conviction in her only trial. Under long-standing California law, retrial is not barred after a successful defense motion under section 1181, subdivision 6, after a jury conviction. (§ 1180; *People v. Serrato* (1973) 9 Cal.3d 753, 761 [109 Cal.Rptr. 65, 512 P.2d 289], overruled on other grounds in *People v. Fosselman* (1983) 33 Cal.3d 572, 503 [189 Cal.Rptr. 855, 659 P.2d 1144].)

Nor can we agree with Craney that constitutional guarantees of equal protection bar an appeal of this order. In this argument, Craney points out that the prosecution may not appeal a judgment of acquittal granted on a section 1118.1 motion, prior to a jury verdict. (§ 1118.2.) She argues that she is similarly situated to such a defendant, so that appeal here is barred by state and federal guaranties of equal protection.

We agree with appellant that the two situations are dissimilar. As *Salgado* noted, the legislative history of section 1238 indicates that the Legislature intended to expand the prosecution's right to appeal to the extent that it could do so consistent with the double jeopardy provisions of the state and federal Constitutions. "A legislative committee report states that the amendment was enacted to permit the prosecution to appeal in all situations 'except where the appeal would violate double jeopardy,' thereby bringing the scope of appeals by the People into conformity with federal law. (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1850 (1997-1998 Reg. Sess.) as amended May 12, 1998.) The committee report cites instances of injustice because section 1385 dismissals could not be appealed after a guilty verdict and states that, without appellate review, legal issues would be decided by trial judges with no procedure to assure uniformity or correctness of trial court decisions. (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1850 (1997-1998 Reg. Sess.) as amended May 12, 1998.)" (*People v. Salgado, supra,* 88 Cal.App.4th at p. 12.)

A defendant who has been convicted by a jury is not in the same situation as a defendant acquitted by the court, where no jury has ruled. A defendant who has been acquitted under 1118.1 has never suffered a jury conviction, and a successful prosecution appeal could, if allowed, lead to a forbidden

retrial and a conviction. Where (as here) there has been a jury conviction, the appeal can only reinstate that conviction, and there is no double jeopardy problem.

Finally, we do not find Craney's citation to *People v. Hatch* (2000) 22 Cal.4th 260 [92 Cal.Rptr.2d 80, 991 P.2d 165], persuasive. In *Hatch*, the trial court declared a mistrial after a jury deadlock, then dismissed the case under section 1385. The prosecution refiled the charges. (§ 1387.) The defendant filed a petition for habeas corpus alleging that the second prosecution was barred on double jeopardy grounds. The prosecution appealed both the section 1385 dismissal and the order granting the habeas corpus petition. The court summarized its rulings thusly: "we reverse the grant of the habeas corpus petition on the ground the trial court did not dismiss for legal insufficiency of the evidence even though it had the power to do so. Because we conclude the dismissal was not equivalent to an acquittal for purposes of double jeopardy, we do not address the propriety of the section 1385 dismissal or reach the issue of whether a section 1385 dismissal for legal insufficiency is appealable." (*Hatch*, at pp. 267-268, fn. omitted.)

Craney cites *Hatch*'s holding that "*when* a trial court rules that the evidence is insufficient as a matter of law should not determine whether that ruling operates as a bar to double jeopardy." (*People v. Hatch, supra,* 22 Cal.4th at p. 270, italics in the original.) She then argues that the ruling here was an acquittal for insufficiency of the evidence, again cites the rule that a judgment of acquittal under section 1118.1 bars an appeal, and argues that appeal is thus barred here, too.

We do not see that *Hatch* compels any such conclusion. The court made the cited observation in the portion of the opinion in which it rejected the contention that section 1385 does not permit dismissals for legal insufficiency of the evidence and held that "it makes no sense to prohibit trial courts from acquitting for legal insufficiency after the case has been submitted . . . , and we decline to do so." (*People v. Hatch, supra,* 22 Cal.4th at p. 271.)

In *Hatch*, the court determined that the record did not show that the dismissal was for insufficiency of the evidence, and that retrial was thus permitted, and specifically left open "the remaining issue: whether a section 1385 dismissal for legal insufficiency is appealable," noting that "[o]f course, our conclusion that such a dismissal is equivalent to an acquittal for double jeopardy purposes does not automatically bar appellate review." (*People v. Hatch, supra,* 22 Cal.4th at p. 276.)

The question *Hatch* left open was considered and resolved by *Salgado.* As *Salgado* found, a postconviction section 1385 dismissal for insufficiency of

the evidence may be appealed, because section 1238 authorizes such an appeal and because "appellate review of a dismissal for legal insufficiency will not result in another trial." (*People v. Salgado, supra,* 88 Cal.App.4th at p. 13.)

2. *The evidence was insufficient to support the conviction**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## Disposition

The judgment is affirmed.

Grignon, Acting P. J., and Mosk, J., concurred.

---

*See footnote, *ante,* page 431.